Jamison R. McCune, OSB No. 135547
Email: mccune@bodyfeltmount.com
BODYFELT MOUNT LLP
319 SW Washington St., Suite 1200
Portland, Oregon 97204
Telephone: (503) 243-1022
Facsimile: (503) 243-2019

Veronica L. Manolio
Email: vmanolio@mf-firm.com
MANOLIO & FIRESTONE, PLC
8686 E. San Alberto Dr., Suite 200
Scottsdale, Arizona 85258
Telephone: (480) 222-9100
Facsimile: (480) 222-9106
*Pro Hac Vice Pending*

Of Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| PACIFIC OFFICE AUTOMATION INC., an Oregon corporation,<br><br>Plaintiff,<br><br>v.<br><br>PITNEY BOWES INC., a Delaware corporation; PITNEY BOWES GLOBAL FINANCIAL SERVICES LLC, a Delaware limited liability company; THE PITNEY BOWES BANK, INC., a federal banking institution; and WHEELER FINANCIAL FROM PITNEY BOWES INC., a Delaware corporation,<br><br>Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Pacific Office Automation, Inc. (“POA”) brings this suit for breach of contract, to challenge and seek redress under the antitrust laws of the United States (and related

Connecticut statutes), and to address supplemental common law claims against Defendants Pitney Bowes Inc., Pitney Bowes Global Financial Services LLC, The Pitney Bowes Bank, Inc., and Wheeler Financial From Pitney Bowes Inc., alleging:

## INTRODUCTION AND SUMMARY

1. POA is an Oregon-based company and prides itself on being the largest independent (private) dealer of office equipment in the United States. While POA began as a company strictly selling photocopy machines and related accessories (in the 1970s), its business has grown to incorporate multiple types of office equipment and systems, including copiers, printers, security cameras, unified communications systems, scanners, fax machines, postage meters, and mailing systems. POA has distinguished itself in the marketplace through outstanding service and support of the products it sells and leases.

2. Within the office equipment industry, multiple equipment manufacturers have their own "direct sales" divisions, which means that a given company may not only manufacture products but also sell directly to end users of those products. In addition, manufacturers permit outside entities (like POA) to act as "resellers" and to sell, install, service, and support equipment that is manufactured by others. In this Complaint, resellers are referred to as "Dealers."

3. Pitney Bowes Inc. ("Pitney Bowes") now hails itself as a "global technology company," but it was founded on making postage meters commercially available. The company is most known for postage meters and related mailing accessories (both hardware and software).

4. The mailing equipment industry is unique in that the postage meter used for printing official U.S. postage cannot be sold, but pursuant to United States Postal Service Regulations, must be rented from an authorized manufacturer, such as Pitney Bowes. These meters are then placed upon a base unit with additional features such as a scale,



BODYFELT MOUNT LLP
Attorneys at Law
319 SW Washington Street, Suite 1200
Portland OR 97204
Phone: 503-243-1022 Fax: 503-243-2019

sealer, feeder, or inserter. The base unit and accompanying equipment may be sold or leased directly to the end user by Dealers or other third parties

5. POA and Pitney Bowes compete against one another to lease postage meters and sell, install, and support mailing equipment and related services and accessories to commercial end users.

6. Pitney Bowes has a behemoth presence in the mailing equipment industry. Pitney Bowes has dominated the market for years by controlling 70% or greater of the market share in postage meter placements. Pitney Bowes has even been hailed as the "900-pound Mail Gorilla."

7. With expanding technology and a sharp decline in the use of domestic (U.S.) postal services,[1] Pitney Bowes has actively engaged in conduct to ensure that it maintains its power in the mailing equipment industry, and it has acted specifically to destroy competition through improper and anticompetitive conduct.

8. Traditionally, Pitney Bowes sold directly to end users. With declining market share, Pitney Bowes turned to independent dealers to augment its sales efforts. By doing so, Pitney Bowes was able to lower costs and maintain market dominance.

/ / /

/ / /

---

[1] By 2016, the U.S. Postal Service had its fifth straight year of operating loss, which came after 2011 reports that the USPS was "going out of business." *See*, *e.g, "United States Postal Service FY2016 Annual Report to Congress,"* USPS, February 2017 (original dated January 28, 2017); *see also*, Hartung, Adam, *"Why the Postal Service Is Going out of Business*," *Forbes* (December 6, 2011); Leonard, Devin, *"The Postal Service is Running Out of Options," Bloomberg Businessweek* (November 8, 2014); Schmid, Randolph E., *"Postal Service Struggles: What Would the U.S. Do Without Mail?"* Huffington Post (November 10, 2011).

By 2017, it was reported that first-class U.S. mail declined by 43% from 2001, based on the increased use of electronic mail and the internet for correspondence and business transactions. *See*, "*First-Class Mail Volume Since 1926*," USPS, March 2018 (archived), original dated July 23, 2018.



BODYFELT MOUNT LLP
Attorneys at Law
319 SW Washington Street, Suite 1200
Portland OR 97204
Phone: 503-243-1022 Fax: 503-243-2019

9. Pitney Bowes was able to attract Dealers with promises of profitability, assigned accounts, and competitive pricing. Dealer relationships were formed based upon the "PBI - Dealer Agreement" attached hereto as **Exhibit 1**.

10. On June 30, 2016, Pitney Bowes and POA entered the "PBI - Dealer Agreement."

11. Under Section 2.01(6) of the PBI - Dealer Agreement, Pitney Bowes and POA agreed to a covenant of good faith, fair dealing, and fair trade practices as follows:

> Dealer agrees to use its best efforts to promote, sell, install and service (subject to Section 4.03(2), all PBI Products provided to Dealer in the assigned Territory. PBI and Dealer further understand and agree to the implied covenant of good faith and fair dealing as well as agreeing to abide by fair trade practices with respect to this Agreement and to the purchase and sale of PBI Products and the provisions of Services among themselves and to Customers.

(Exhibit 1, Section 2.01(6).)

12. Under Section 6.02(5) of the PBI - Dealer Agreement, Pitney Bowes agreed not to use POA's Customer information as follows:

> In addition to the above obligations, although PBI may possess (a) the identity of Dealer Customers, (b) the type and kind of service provided to Dealer's Customers in relation to PBI Products, and (c) supplies ordered or received from PBI, **PBI will not use such information to market PBI Products, services or supplies to such Dealer Customers**, unless otherwise permitted in writing by Dealer, during (i) the Term and one year thereafter, if this Agreement expires and is not otherwise terminated earlier by PBI pursuant to Section 7.01(2) herein, or (ii) the Term, if PBI terminates this Agreement pursuant to Section 7.01(2) herein.

(Exhibit 1, Section 6.02(5) (emphasis added).)

13. In reliance upon the promises in the PBI - Dealer Agreement, POA placed an initial order for Pitney Bowes Products in excess of one-half million dollars ($500,000).

14. In marketing, selling, leasing, installing and servicing Pitney Bowes Products, POA was required (consistent with United States Postal Regulations) to provide



BODYFELT MOUNT LLP
Attorneys at Law
319 SW Washington Street, Suite 1200
Portland OR 97204
Phone: 503-243-1022 Fax: 503-243-2019

Pitney Bowes with complete end user information in conjunction with the meter rental by Pitney Bowes.

15. As Dealer relationships matured Pitney Bowes utilized the PBI - Dealer Agreement to limit competition and "tilt the table" in its own favor. Moreover, Pitney Bowes used these Agreement(s) as a pretext to, at least: 1) learn "inside" end user and/or other trade secret information from Dealers, which information was shared with Pitney Bowes' direct salespeople and telemarketers to unfairly compete with Dealers; 2) prohibit authorized Dealers from selling any other brands of mailing equipment; 3) prohibit Dealers from selling certain *lines* of Pitney Bowes' products, eliminating competition for those products that Pitney Bowes successfully sells through its direct sales division; 4) prohibit Dealers from soliciting Pitney Bowes customers who are "at risk" or otherwise plan to leave Pitney Bowes' "grip" on them; and 5) refusing to fairly deal with its own end users when there is/was any threat of outside competition.

16. Despite the specific restriction under Section 6.02(5) in the PBI - Dealer Agreement, Pitney Bowes used POA's customer information to solicit sales and services, and Pitney Bowes telemarketers regularly called POA customers to attempt to market sales, upgrades, supplies, and services. On information and belief, in breach of Section 6.02(5) of the PBI - Dealer Agreement, Pitney Bowes provided access to a list of POA Customers to Pitney Bowes telemarketers.

17. In addition, Pitney Bowes has created a subsidiary business, wholly owned and controlled by Pitney Bowes, "Wheeler Financial," which Pitney Bowes uses to finance its equipment leases at above-market interest rates. Pitney Bowes has recently used its Dealer Agreements to strong-arm Dealers into using Pitney Bowes' leasing, further

/ / /

/ / /



BODYFELT MOUNT LLP
Attorneys at Law
319 SW Washington Street, Suite 1200
Portland OR 97204
Phone: 503-243-1022 Fax: 503-243-2019

exploiting its dominance of the mailing equipment market and harming end users by failing to offer alternative options and/or competitive pricing.[2]

18. Pitney Bowes' misconduct is not only anticompetitive, but it is predatory and causes harm to Dealers (who are competitors in the relevant market) and end users.

**PARTIES**

19. POA is an Oregon corporation, with its principal place of business/ headquarters in Beaverton, Oregon. POA is an independent office equipment Dealer that offers business equipment and service solutions to businesses. Its solutions include postage meters, mail folders/inserters, and mail management software (along with parts and supplies for each). POA also offers "service agreements" for the postage equipment items it places.

20. Pitney Bowes Inc. is a Delaware corporation with a principal place of business at 3001 Summer Street, Stamford, Connecticut 06926. Pitney Bowes revolutionized the postage equipment industry in the early 1900s by creating the first commercially-available postage meter approved by the United States Postal Service.

21. Pitney Bowes Global Financial Services LLC ("PBGFS") is a Delaware limited liability company with its principal place of business in Stamford, Connecticut. PBGFS is directly owned and controlled by Pitney Bowes and offers financing to its customers.

22. The Pitney Bowes Bank, Inc. ("The Pitney Bank") is a federal banking institution with its principal place of business in Salt Lake City, Utah. The Pitney Bank is owned and controlled by Pitney Bowes and/or it is under common control and ownership.

/ / /

[2] All postage meters are leased, not purchased, because postal regulations prohibit sales. The United States is the sole country that prohibits the sale of postage meters. Postage machines are regulated because postage is a form of <u>currency</u> in the United States.



BODYFELT MOUNT LLP
Attorneys at Law
319 SW Washington Street, Suite 1200
Portland OR 97204
Phone: 503-243-1022 Fax: 503-243-2019

23. Wheeler Financial From Pitney Bowes Inc. ("Wheeler Financial") is a Delaware corporation with its principal place of business listed in Stamford, Connecticut. Wheeler Financial is owned and controlled by Pitney Bowes and does business as a "subsidiary" of The Pitney Bank.

## JURISDICTION AND VENUE

24. This case principally arises under 15 U.S.C. § 2 (the Sherman Act, § 2) and 15 U.S.C. §§ 12, 15 (the Clayton Act, § 4) but also involves state and common law claims.

25. This Court has subject matter jurisdiction over POA's federal antitrust claims pursuant to 15 U.S.C. § 15(a) and 28 U.S.C. §§ 1331, 1337.

26. This Court has supplemental jurisdiction over the state/common law claims pursuant to 28 U.S.C. § 1367 because the matters are so closely related to the federal claims that they form a part of the same case and controversy.

27. The Court has jurisdiction over each of the Defendants named in this action pursuant to 15 U.S.C. §§ 15, 22 as each of them transact business in this District.

28. Venue is proper here under 15 U.S.C. §§ 15, 22 and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events giving rise to POA's claims occurred in this District, POA maintains its principal place of business in this District, and each of the Defendants is subject to this Court's personal jurisdiction as a matter of antitrust law.

## FACTUAL ALLEGATIONS

### A. The Relevant Market: Mailing Equipment

29. In its simplest form, the office equipment industry in the United States generally involves hardware (*i.e.*, photocopiers, printers, fax machines, postage meters), software, and related accessories, supplies, service, support, and/or maintenance.

/ / /

/ / /



BODYFELT MOUNT LLP
Attorneys at Law
319 SW Washington Street, Suite 1200
Portland OR 97204
Phone: 503-243-1022 Fax: 503-243-2019

30. As a corollary to the sale of office equipment, third-party lending/financing becomes important due to favorable tax treatments for end users. Most commercial end users choose to lease office equipment, as commercial equipment tends to be expensive.

31. Within the office equipment industry is a separate or "sub-market" of mailing equipment, which includes only the mailing related portions of office equipment, *i.e.,* scales, sealers, feeders, inserters, mailing related software, accessories, and supplies; and service/maintenance/support agreements.

32. As noted above, postage meters must be leased from the manufacturer authorized by the U.S. Postal Service because sale is not permitted. *See*, fn. 2, *supra*.

33. The U.S. Postal Service has limited authorization for the production of postage meters and postage to a few companies: Neopost, Francotyp Postalia, Data-Pac, and Stamps.com.

34. Virtually every Dealer of office equipment will have/use multiple Lenders, who compete, in order to offer end users competitive terms for the financing of office equipment. This type of "shopping" for financing is much like the transaction that private individuals enter when purchasing a vehicle: the vendor (whether a car dealer or office equipment dealer) enters a contract or obtains an "order" to purchase, then the vendor will gather financial information from the consumer and "shop" its business to find the most competitive and beneficial financing terms for the consumer.

35. In the mailing equipment industry, the rental cost of the postage meter is typically billed directly by the manufacturer while the base equipment, service, supplies, and support is billed by the Dealer, such as POA. In some transactions both charges are bundled together into a single "lease" payment.

36. POA and Pitney Bowes are direct competitors in mailing equipment, competing both in the original leasing as well as buyouts or replacement services.



BODYFELT MOUNT LLP
Attorneys at Law
319 SW Washington Street, Suite 1200
Portland OR 97204
Phone: 503-243-1022 Fax: 503-243-2019

### *1. Market Share*

37. Although POA and other Dealers have the actual or potential ability to deprive each other of significant levels of sales in of postage equipment, Pitney Bowes has been known to dominate and control the postage equipment industry. It holds an approximate 70% market share in postage meter placement across the United States.[3],[4]

### *2. Barriers to Entry*

38. There are only five (5) postage meter manufacturers that are regulated and endorsed by the USPS, and based on the federal regulatory product requirements, it is nearly impossible to enter the postage equipment market by developing/manufacturing a new competing product.[5] In fact, only one company (Data-Pac) has been able to enter the manufacturing/marketing of new postage meters in the past 25+ years.

39. Of the competing brands, Pitney Bowes has become far and away the most dominant, not only in terms of profit, but in terms of the number and variety of the mailing equipment products it offers.

40. Moreover, based on its long-term presence, Pitney Bowes has established a brand that is highly recognizable, and end users have become entrenched in leasing/using this established brand name.

41. For these reasons, the mailing equipment industry faces significant barriers to entry (new rivals find it extremely difficult to enter the market by producing competing equipment based on the regulatory requirements and the significant capital costs and time necessary to gain entry), and competitors face significant barriers to expanding (as

---

[3] For purposes of this Complaint, the United States should be deemed the relevant market territory, as commercial end users throughout the entire U.S. create the geographic market for purchasing postage equipment, and both POA and Pitney Bowes sell and lease mailing equipment nationwide.

[4] Some sources show an even greater market share; this 70% is alleged conservatively.

[5] Two of the manufacturers recently converged, reducing the number to four, nationwide.



BODYFELT MOUNT LLP
Attorneys at Law
319 SW Washington Street, Suite 1200
Portland OR 97204
Phone: 503-243-1022 Fax: 503-243-2019

they are constrained to those established and authorized brands that already exist, as well as being constrained to having to acquire financing for the product(s).

42. The barriers to entry are further exasperated by the steep decline in First Class Mail in favor of digital alternatives.

43. These factors allow Pitney Bowes, an "incumbent," to monopolize returns, control and dictate pricing, and to exclude competition in the mailing equipment industry.

44. Pitney Bowes is, indeed, known to be more costly than the competing brands of postage meter products offered, and Pitney Bowes is known to have "strict" leasing contracts.

**B. Pitney Bowes' Anticompetitive or Exclusionary (Mis)Conduct**

45. Pitney Bowes has had a long and lucrative history in mailing equipment.

46. By entering a "Dealer Agreement" with Pitney Bowes, outside Dealers like POA (who already competed in mailing equipment) are able to compete more expansively by offering Pitney Bowes' products in addition to other lines/brands represented.

47. Pitney Bowes' Dealer Agreements promised fair competition by allowing Dealers to directly compete in the marketplace. The Agreement(s) permitted Dealers to sell to both existing **and** new customers. Specifically, the Agreements permitted Dealers to "present and potential purchasers," more clearly defined as:

- "**growth**" business (end users who did not have Pitney Bowes' products, had no products, or had other competitors' products that would be displaced in favor of Pitney Bowes);
- "**collaborative**" business (business that Pitney Bowes currently had but then "assigned" to the Dealer to retain and service);
- "**legacy**" business (existing customers of Pitney Bowes who had been sold by Pitney Bowes' own direct sales division, rather than an outside competitor); and
- "**at risk legacy**" business (existing legacy customers whom Pitney Bowes had identified as being at risk of losing, and the Dealer was engaged to save the customer from leaving for a competitor).



BODYFELT MOUNT LLP
Attorneys at Law
319 SW Washington Street, Suite 1200
Portland OR 97204
Phone: 503-243-1022 Fax: 503-243-2019

48. While Dealer Agreements included "Product Sales Expectation Targets," which Pitney Bowes established by settling sales volume targets/expectations in the Dealer(s)' defined territories, these were sales expectations that were to be set annually.

49. The Dealer Agreements assured Dealers that Pitney Bowes could not increase the annual "Expectation Targets" by any more than 9% of the prior year's set expectations.

50. The Dealer Agreements mandated Dealers to "first offer" leasing options to end users by using PBGFS, Secap Finance, or a Pitney Bowes "affiliate," but Dealers could seek outside financing/lenders only if any of the Pitney Bowes entities/affiliates declined to offer financing.

51. The Dealer Agreements set forth "Tiers" for a commission structure, which outlined: 1) the percentage or margin (discount) at which Dealers could purchase product to resell, based on the product/category; 2) the percentage of commission to be earned on sales; 3) the "bonuses" available for securing financing through PBGFS or one of Pitney Bowes' affiliates; and 4) promised Dealers with multiple "special programs" to help promote competition, including lead generation and access to the "inside" sales group.

52. The commission structure or "Tier" levels were each based on the volume (total sales) completed by a Dealer.

53. In addition, Dealers were given discretion to offer Pitney Bowes' products "up to" 125% of the MSRP, encouraging Dealers to set pricing and fairly compete.

54. In exchange, the Dealer Agreements committed Dealers to employ and train adequate numbers of staff to market, sell, and service Pitney Bowes' products, which training was to be conducted at the Dealers' expense. The Agreements also required Dealers to purchase Pitney Bowes' product first, then offer it for resale to others.

/ / /



BODYFELT MOUNT LLP
Attorneys at Law
319 SW Washington Street, Suite 1200
Portland OR 97204
Phone: 503-243-1022 Fax: 503-243-2019

55. POA, in fact, entered a Dealer Agreement with Pitney Bowes on or about June 30, 2016, which included a three (3) year term, to offer postage equipment products – including Mail Finishing Equipment, Mail Creation Equipment, Software Solutions, and Parts and Supplies – as well as "Service Agreements" (maintenance services) for Pitney Bowes' postage equipment.

56. At the time POA entered its Dealer Agreement, it was assigned to an established "Tier 3" Dealership Program, anticipating it would place more than $600,000 of Pitney Bowes' "products, parts, and supplies" each year.

57. POA, like many other Dealers, undertook training for its staff (at least 38 staff members attended training) at a cost of approximately $234,705 to POA.

58. Also like many other Dealers, POA ordered in excess of $460,000 of Pitney Bowes' product immediately and paid Pitney Bowes for the product it ordered.

59. Recognizing that Pitney Bowes' North America Mailing division lost approximately $15 Million in the first half of 2016, and suffered from the continued decline in the mailing industry, Pitney Bowes undertook strong efforts to maintain its market power in the mailing-equipment industry.

60. By January 1, 2017, Pitney Bowes implemented a widespread program, the new "Partner Compensation Plan" that effectively destroyed competition by any Dealer and overtly monopolized new business in favor of Pitney Bowes' internal/direct sales:

a. Dealers would no longer receive credit for sales to any existing Pitney Bowes customers ("legacy" business);

b. Dealers did not get purchase discounts nor earn commissions from selling to any existing Pitney Bowes customers; yet,

c. Sales to existing Pitney Bowes customers **must be sold** using PBFGS for financing;

d. Dealers could no longer sell to "at risk legacy" customers without receiving "approval of Region leadership" at Pitney Bowes; and



BODYFELT MOUNT LLP
Attorneys at Law
319 SW Washington Street, Suite 1200
Portland OR 97204
Phone: 503-243-1022 Fax: 503-243-2019

e. Dealers were now limited to selling Pitney Bowes products at the MSRP (no discretion to sell “up to 125% of MSRP as prior).

61. In addition, Pitney Bowes interfered with Dealer competition by, at least: accusing Dealers of “interference” when competing within an existing customer; withholding “approval” for Dealers to sell to any identified “at risk” customer; and, specific to POA, by threatening with a “cease and desist” when POA fairly and permissibly offered competitive brands/postage products to potential customers.

62. Based on POA’s experiences, alone, Pitney Bowes has additionally engaged in anti-competitive conduct between 2017 and 2019 by at least the following:

a. Providing an existing contract “buyout” figure, allowing POA to buyout an existing lease obligation with Pitney Bowes (and allowing POA to enter a new agreement with a customer/potential customer), and then after Pitney Bowes receives its quoted buyout figure, refusing to honor the buyout amount (and/or demands additional funds). This conduct not only harms the Dealer, but also the end user;

b. Refusing to provide POA with “buyout” figures and/or necessary lease information of existing customers prohibiting POA from replacing Pitney Bowes equipment with a new agreement and equipment. Regardless whether POA is selling new/upgraded Pitney Bowes equipment or a competitor’s equipment, this conduct is expressly intended to thwart end users from switching/buying out of Pitney Bowes equipment. Not only does this behavior force customers into automatic “renewed” leases with Pitney Bowes, harming the end user, but it expressly stops competition; and

c. Refusing to activate new devices/postage meters after POA has been successful in soliciting an existing customer into entering a new lease/agreement with POA.

63. POA has reasonable belief that these types of anti-competitive acts were taken not only toward POA but to all Dealers of Pitney Bowes.

64. In the calendar year 2018, Pitney Bowes set up a new lending institution through The Pitney Bank, which does business as “Wheeler Financial” though it is a

/ / /



BODYFELT MOUNT LLP
Attorneys at Law
319 SW Washington Street, Suite 1200
Portland OR 97204
Phone: 503-243-1022 Fax: 503-243-2019

known "subsidiary" of The Pitney Bank and shares common ownership and control with both Pitney Bowes and The Pitney Bank.

65. By early 2019, Pitney Bowes undertook termination of the original PBI - Dealer Agreement and replaced it with anticompetitive terms, like:

a. Not allowing Dealers to offer for lease postage meters, but only the related software and accessories;

b. Not allowing a Dealer to sell or offer any competing brands;

c. No longer allowing Dealers to compete within existing end users;

d. Mandating that end users had to finance through a Pitney Bowes affiliate (namely, Wheeler Financial), unless Pitney Bowes and/or its affiliates declined the business; *but*

e. If the end user order was "not limited to" Pitney Bowes' products, the Dealer was not permitted to complete the transaction;

f. Pitney Bowes could "terminate" its Dealer Agreements any time for its own "convenience" (with no reason given); and

g. Upon termination of the Agreements, Dealers would have to "end the servicing relationship" of their own end users.

66. In essence, Pitney Bowes acted in a manner to remove the leasing of all postage meters (the most important product involved) from its Dealers. Dealers were limited to selling accessories/related software, but if competing brand postage meters were "bundled" with Pitney Bowes' accessories/software, Pitney Bowes strictly prohibited the deal from being financed. This was an intentional "Catch-22."

67. If Dealers did not acquiesce to these anticompetitive and exclusionary demands, Pitney Bowes prohibited them from selling any Pitney Bowes products whatsoever, effectively removing them from the mailing equipment industry.

68. Through these acts (and likely more to be discovered), Pitney Bowes has intentionally acted to impair its rivals in unnecessary and highly restrictive manner(s).

/ / /



BODYFELT MOUNT LLP
Attorneys at Law
319 SW Washington Street, Suite 1200
Portland OR 97204
Phone: 503-243-1022 Fax: 503-243-2019

69. POA expressed its concerns of this exclusionary and/or anticompetitive conduct to Pitney Bowes on a number of occasions, but no corrections were made.

**C. Lack of Justification for Defendants' Actions**

70. Pitney Bowes' actions were not meant to "vigorously compete" in the postage equipment market; Pitney Bowes took concerted efforts to maintain its monopoly power by excluding any viable competition.

71. By impairing rivals (*i.e.*, engaging multiple Dealers to sell Pitney Bowes' products, to the exclusion of those sellers being permitted to offer any other/competitive market products; not allowing Dealers to finance unless Pitney Bowes "chose" to be the financer, and/or not allowing outside financing if non-Pitney Bowes' products were included) and by unfairly and unnecessarily restricting competition (*i.e.*, not permitting Dealers to offer all Pitney Bowes' most desired products (postage meters); not allowing Dealers to "bundle" other competing brands of equipment to best meet end user needs), Pitney Bowes has intended to keep an internal "grip" on whatever sales remain in this declining market.

72. These acts are not merely "incidental effects" of Pitney Bowes' desire to grow its profitability. Quite the opposite, Pitney Bowes' conduct in the past few years has been deliberate and well-planned, in response to the decline in overall profitability. The stock price of Pitney Bowes sits at an all-time low. Pitney Bowes is intentionally trying to maintain its market dominance despite a rapidly changing landscape of end users' needs for mailing equipment.

**D. Antitrust Harm/Injuries to POA (and Consumers)**

73. Through its acts, Pitney Bowes has driven viable Dealers/competitors out of the mailing equipment market.

/ / /



BODYFELT MOUNT LLP
Attorneys at Law
319 SW Washington Street, Suite 1200
Portland OR 97204
Phone: 503-243-1022 Fax: 503-243-2019

74. Though POA's individual losses are an *example* of the injuries that Pitney Bowes has created, Pitney Bowes' actions have caused actual injury to competition as well as injury to end users, far beyond the impact/injury to POA.

75. Pitney Bowes' infliction of injury is not the result of neutral or competitive conduct; the injuries flow from Pitney Bowes' intention to eliminate competition in the relevant market (and to capture all remaining end users at inflated costs).

**COUNT I**

**(Breach of Contract Against Defendant Pitney Bowes Inc.)**

76. POA incorporates the foregoing allegations of this Complaint as if repeated here verbatim.

77. In breach of the PBI - Dealer Agreement, Pitney Bowes has willfully and repeatedly breached its contract with POA by, at least:

a. Violating the implied covenant of good faith and fair dealing under Section 2.01(6);

b. Using POA's Confidential Customer Information for sales and marketing purposes without POA's written consent, to engage in unfair competition with POA in violation of Section 6.02(5);

c. Failing to adhere to the Product Sales Expectations Targets set forth, in violation of Section 3.01(2)-(3).

*See*, **Exhibit 1**.

78. As a direct and proximate result of Pitney Bowes' breaches of the PBI - Dealer Agreement, POA has suffered damages of at least $2,000,000.

79. WHEREFORE, Plaintiff Pacific Office Automation prays for judgment in its favor and against Defendant Pitney Bowes Inc. for compensatory damages of at least $2,000,000, and for such other and further relief as this Court deems just and proper.

/ / /

/ / /



BODYFELT MOUNT LLP
Attorneys at Law
319 SW Washington Street, Suite 1200
Portland OR 97204
Phone: 503-243-1022 Fax: 503-243-2019

**COUNT II**

**(Violation of the Connecticut Unfair Trade Practices Act**

**Against Defendant Pitney Bowes Inc.)**

80. POA incorporates the foregoing allegations of this Complaint as if repeated here verbatim.

81. Pursuant to Section 8.14 of the PBI - Dealer Agreement, Pitney Bowes and POA agreed that Connecticut law would govern their relationship.

82. Pitney Bowes engaged in unfair trade practices in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b by, at least:

a. Requiring POA to utilize Pitney Bowes Leasing Affiliates on all transactions including only Pitney Bowes Products;

b. Requiring POA to utilize Pitney Bowes Leasing Affiliates on all transactions despite more favorable terms and conditions available to end users;

c. Using POA's Confidential Customer Information for sales and marketing purposes without POA's written consent; and

d. Inducing POA to place Pitney Bowes Products with its established end user base and then refusing to renew the PBI - Dealer Agreement under fair and equitable terms that promoted competition.

83. As a direct and proximate result of Pitney Bowes' unfair trade practices, POA has suffered damages of at least $2,000,000.

84. Pitney Bowes' actions were taken deliberately, maliciously and willfully. As a result, POA is entitled to punitive damages of at least $1,000,000.

85. POA is further entitled to recover its reasonable costs and attorneys' fees incurred in this matter under Conn. Gen. Stat. § 42-110g.

86. WHEREFORE, Plaintiff Pacific Office Automation prays for judgment in its favor and against Defendant Pitney Bowes Inc. for:

a. compensatory damages of at least $2,000,000.



BODYFELT MOUNT LLP
Attorneys at Law
319 SW Washington Street, Suite 1200
Portland OR 97204
Phone: 503-243-1022 Fax: 503-243-2019

b. punitive damages of at least $1,000,000;

c. reasonable costs and attorneys' fees incurred in this litigation; and

d. such other and further relief as this Court deems just and proper.

**COUNT III**

**(Fraudulent Inducement Against Defendant Pitney Bowes Inc.)**

87. POA incorporates the foregoing allegations of this Complaint as if repeated here verbatim.

88. At the time POA entered the PBI - Dealer Agreement, dated June 30, 2016, Pitney Bowes falsely represented that it intended to abide by the terms and conditions of the PBI - Dealer Agreement.

89. At the time that Pitney Bowes made this false representation, it had no intention to abide by the terms of the contract and entered into said contract for the sole purpose of obtaining confidential and proprietary information regarding POA's end users so that Pitney Bowes could solicit those customers and take customers away from POA.

90. At the time Pitney Bowes entered into the Dealership Agreement, it made material misrepresentations to POA as well as it omitted material facts from POA that were intended to have POA enter into the Agreement. At least, Pitney Bowes:

a. Intentionally misrepresented that POA would be permitted to sell Pitney Bowes' postage equipment to existing customers and earn commissions/profit from those deals;

b. Intentionally misrepresented that POA would be paid commissions and would have sales expectations based on an annual target, which could only change annually and, which changes could not exceed more than 9% greater than the year prior;

c. Intentionally misrepresented that POA would be permitted to sell products to "at risk" customers that Pitney Bowes was at risk of losing, and that Pitney Bowes would assist in facilitating sales;



BODYFELT MOUNT LLP
Attorneys at Law
319 SW Washington Street, Suite 1200
Portland OR 97204
Phone: 503-243-1022 Fax: 503-243-2019

d. Intentionally misrepresented that POA would be permitted to continue business with a current competitor, Francotyp-Postalia, or "FP" without incident;

e. Intentionally omitted that Pitney Bowes was intending to remove competitors from the marketplace, including outside dealers, in the short-term based on a downturn in postage meter usage; and

f. Intentionally omitted that Pitney Bowes already had new commission structures/regulations on competition in the works.

91. Pitney Bowes' affirmative representations, as discussed above, were false at the time they were made. Moreover, the intentional omissions made by Pitney Bowes were materially false, intentionally withholding material information from POA.

92. Each of the facts and omissions stated above were material to POA, as POA would not have entered the Dealership Agreement and made a significant cost and time investment into Pitney Bowes if not for the misrepresentations and/or omissions.

93. Pitney Bowes knew that its misrepresentations and material omissions were being made, and Pitney Bowes made the misrepresentations (or omitted the material facts) intending that POA would rely on the statements/misstatements to enter into the Dealership Agreement.

94. POA did not know of Pitney Bowes' misrepresentations or omissions, nor did it have reason to know or suspect that Pitney Bowes would act with such a reckless disregard for the truth.

95. POA relied on Pitney Bowes' statements as truthful and accepted its omissions or silence about its intentions when entering into the Dealership Agreement and committing to an expensive and expansive endeavor to sell Pitney Bowes' products.

96. POA had every right to rely on Pitney Bowes' truthfulness/representations, as Pitney Bowes had long established itself as a mammoth presence as a competitor (and as it has been federally endorsed and regulated as a viable postage equipment entity in the United States).



BODYFELT MOUNT LLP
Attorneys at Law
319 SW Washington Street, Suite 1200
Portland OR 97204
Phone: 503-243-1022 Fax: 503-243-2019

97. As a result of Pitney Bowes' misrepresentations and material omissions, which induced POA into the Dealership Agreement, POA was injured by, at least:

a. Investing an immediate cost (approximated at $234,705) into training of POA staff to sell and service Pitney Bowes' products;

b. Purchasing equipment of not less than $460,000 directly from Pitney Bowes (to offer for resale); and

c. Excluding other competing brands from its sales portfolio.

98. Pitney Bowes never intended to enter into the PBI - Dealer Agreement in good faith; rather, POA intended to enter into the contract so that Pitney Bowes could obtain the confidential and proprietary information of POA, including its customer lists.

99. POA reasonably relied on Pitney Bowes' false representations when it entered into the PBI - Dealer Agreement and agreed to market Pitney Bowes Products to its end user base.

100. POA did, in fact, convert its established end users to Pitney Bowes Products.

101. Pitney Bowes did, in fact, obtain the customer lists of POA and undercut POA's prices in order to steal POA's end users for itself.

102. Pitney Bowes' fraudulent actions caused POA damages in the amount of at least $2,000,000

103. Pitney Bowes' actions were taken deliberately, maliciously and willfully. As a result, POA is entitled to punitive damages of at least $1,000,000.

104. WHEREFORE, Plaintiff Pacific Office Automation prays for judgment in its favor and against Defendant Pitney Bowes Inc. for:

a. compensatory damages of at least $2,000,000.

b. punitive damages of at least $1,000,000; and

c. such other and further relief as this Court deems just and proper.



BODYFELT MOUNT LLP
Attorneys at Law
319 SW Washington Street, Suite 1200
Portland OR 97204
Phone: 503-243-1022 Fax: 503-243-2019

**COUNT IV**

**(Violation of § 2 of the Sherman Act [Monopolization]**

**Against All Defendants)**

105. POA incorporates the foregoing allegations of this Complaint as if repeated here verbatim.

106. As described above, Pitney Bowes possesses a dominant market share in the postage equipment market and mailing equipment industry, and there are significant barriers to entry into the market. Pitney Bowes possesses monopoly power in this market.

107. Within the past few years, and at least since late 2016, Pitney Bowes has willfully maintained its monopoly power in the postage equipment market and mailing equipment industry by use of anticompetitive (mis)conduct, including, at least:

a. Destroying its competitive "Dealer Agreements" and overtly monopolizing sales through only internal, exclusive, "direct" sales;

b. Intentionally interfering with competitors who have/had the rights to sell Pitney Bowes equipment; and

c. Forcing competitors out of the market entirely.

108. In addition, Pitney Bowes has leveraged its monopoly power by using its power in this market to acquire (or attempt to acquire) monopoly power in a related product – the financing of postage equipment.

109. By creating a "subsidiary" lending institution (Wheeler Financial) and forcing all competitors to use its wholly-controlled financing entity to lease equipment, Pitney Bowes has attempted to monopolize the financing market for postage equipment.

110. By expressly prohibiting competitors from obtaining any financing when Pitney Bowes postage equipment is bundled with competitive equipment, it is apparent that Pitney Bowes is seeking to tie the sale of the desired Pitney Bowes Products to unattractive financial terms offered by Pitney Bowes' affiliates.



BODYFELT MOUNT LLP
Attorneys at Law
319 SW Washington Street, Suite 1200
Portland OR 97204
Phone: 503-243-1022 Fax: 503-243-2019

111. This "leveraging" is particularly indicated since the relevant postage equipment market **requires** leasing/financing.

112. Pitney Bowes has engaged in the monopolizing (mis)conduct in this count through use of one or more of its "affiliate" entities, each of which is a named Defendant, making each of them jointly and severally liable for the actions described in this count.

113. Pitney Bowes has tied the sales of desired Pitney Bowes Products to the undesired Pitney Bowes Affiliate financing.

114. As a result of the Defendants' actions, for which they are all jointly and severally liable, POA has suffered injury in an amount to be proven at trial and which should be automatically trebled pursuant to the Sherman Act.

115. POA is also entitled to recover its attorneys' fees and costs on this count.

116. WHEREFORE, Plaintiff Pacific Office Automation prays for judgment in its favor and against Defendants for:

a. Compensatory damages in an amount to be proven at trial;
b. Treble damages pursuant to the Sherman Act;
c. Attorneys' fees and costs; and
d. Such other and further relief as this Court deems just and proper.

**COUNT V**

**(Violation of § 2 of the Sherman Act [Attempted Monopolization] Against All Defendants)**

117. POA incorporates all foregoing allegations as if repeated here verbatim.

118. In the alternative, and to the extent that Pitney Bowes does not carry the necessary level of monopoly power in the postage equipment market or mailing equipment industry, POA alleges that Pitney Bowes *at least* has attempted to monopolize this market.



BODYFELT MOUNT LLP
Attorneys at Law
319 SW Washington Street, Suite 1200
Portland OR 97204
Phone: 503-243-1022 Fax: 503-243-2019

119. Through the acts described above, which include (but are not limited to): 1) destroying competitive "Dealer Agreements" and overtly forcing sales through only internal, exclusive, "direct" divisions; 2) intentionally interfering with competitors who have/had the rights to sell Pitney Bowes equipment; 3) attempting to force competitors out of the market entirely; and 4) leveraging its power to monopolize a related product – the financing of postage equipment, Pitney Bowes has intentionally tried to destroy competition in the postage equipment market.

120. If Pitney Bowes is not found to have monopoly power in the postage equipment market, there is (at least) a dangerous probability of achieving such power.

121. Similarly, Pitney Bowes has acted with a willful intent to destroy competition in the related market of financing postage equipment, through its acts of "leveraging" its financing products in a market where financing is **required**.

122. Pitney Bowes has lawfully obtained a monopoly position in the mail equipment market and mailing equipment industry and now has improperly used that power in the financing of postage equipment because: 1) it created a wholly-owned and controlled "subsidiary" lending institution; 2) it requires Pitney Bowes' potential end users to finance through this lending institution, failing to offer any alternative financing/lenders; and 3) it refuses to allow competitors to freely market financing options to end users.

123. Pitney Bowes has abused its monopoly position alleged in this count through use of one or more of its "affiliate" entities, each of which is a named Defendant, making each of them jointly and severally liable for each other's actions.

124. As a result of the Defendants' actions, they have harmed competitors and consumers who use mailing equipment. The end users' welfare is affected by, at least, Defendants' failure to offer competitive, fair, and just financing terms.

/ / /



BODYFELT MOUNT LLP
Attorneys at Law
319 SW Washington Street, Suite 1200
Portland OR 97204
Phone: 503-243-1022 Fax: 503-243-2019

125. As a result of the Defendants' actions, for which they are all jointly and severally liable, POA has suffered injury in an amount to be proven at trial and which should be automatically trebled pursuant to the Sherman Act.

126. POA is also entitled to recover its attorneys' fees and costs on this count.

127. WHEREFORE, Plaintiff Pacific Office Automation prays for judgment in its favor and against Defendants for:

a. Compensatory damages in an amount to be proven at trial;

b. Treble damages pursuant to the Sherman Act;

c. Attorneys' fees and costs; and

d. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

128. In accordance with Federal Rules of Civil Procedure 38(b), POA demands a trial by jury on all triable issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff POA requests the following relief, asking that the Court:

A. Decree that Defendants have jointly and severally engaged in unlawful monopolization conduct in violation of Section 2 of the Sherman Act;

B. Decree that Defendants have jointly and severally engaged in unlawful attempted monopolization conduct in violation of Section 2 of the Sherman Act;

C. Enjoin Defendants, their agents, servants, officers, directors, employees, attorneys, privies, representatives, successors and assigns and parent and subsidiary corporations or other related entities, and any or all persons in act of concert or participation with any of them, be preliminarily and permanently, from further monopolizing misconduct, including but not limited to: a) excluding competitors from selling Pitney Bowes products on fair and competitive terms; b) forcing Pitney Bowes



BODYFELT MOUNT LLP
Attorneys at Law
319 SW Washington Street, Suite 1200
Portland OR 97204
Phone: 503-243-1022 Fax: 503-243-2019

consumers to exclusively use Pitney Bowes' affiliates leasing/financing for postage meter products; and c) failing to offer consumers competitive financing options.

D. Award POA damages under the Sherman Act, to be trebled;

E. Award POA damages under the Connecticut Antitrust laws, to be trebled;

F. Award POA damages for Defendants' common law misconduct;

G. Award POA its reasonable costs and expenses incurred in this action, including all expert fees and attorneys' fees;

H. Award both pre-judgment and post-judgment interest at the highest rates permitted by law; and

I. Award any and all further relief as the Court deems appropriate and just.

DATED this 20th day of April, 2020.

**BODYFELT MOUNT LLP**

BY: s/ Jamison R. McCune
Jamison R. McCune, OSB No. 135547
Email: mccune@bodyfeltmount.com
Phone: (503) 243-1022
Fax: (503) 243-2019

Veronica L. Manolio, *Pro Hac Vice Pending*
Email: vmanolio@mf-firm.com
MANOLIO & FIRESTONE, PLC
8686 E. San Alberto Dr., Suite 200
Scottsdale, Arizona 85258
Telephone: (480) 222-9100
Facsimile: (480) 222-9106

Of Attorneys for Plaintiff