Jamison R. McCune, OSB No. 135547
Email: mccune@bodyfeltmount.com
BODYFELT MOUNT LLP
319 SW Washington St., Suite 1200
Portland, Oregon 97204
Telephone: (503) 243-1022
Facsimile: (503) 243-2019

Veronica L. Manolio
Email: vmanolio@mf-firm.com
MANOLIO & FIRESTONE, PLC
8686 E. San Alberto Dr., Suite 200
Scottsdale, Arizona  85258
Telephone: (480) 222-9100
Facsimile: (480) 222-9106
*Admitted Pro Hac Vice*

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

| | |
|---|---|
| PACIFIC OFFICE AUTOMATION INC., an Oregon corporation,<br><br>            Plaintiff,<br><br>v.<br><br>PITNEY BOWES INC., a Delaware corporation; PITNEY BOWES GLOBAL FINANCIAL SERVICES LLC, a Delaware limited liability company; THE PITNEY BOWES BANK, INC., a federal banking institution; and WHEELER FINANCIAL FROM PITNEY BOWES INC., a Delaware corporation,<br><br>            Defendants. | Case No. 3:20-cv-00651-AC<br><br>**PLAINTIFF'S SECOND SUPPLEMENTAL RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES** |

Pursuant to Federal Rules of Civil Procedure 26 and 33 and the recent order of the Court, Plaintiff Pacific Office Automation ("POA") hereby supplementally responds to the

1 – **SECOND SUPPLEMENTAL** RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Defendants' First Set of Interrogatories.  *Supplemental information appears in bold italics. Information that has changed (and/or is no longer applicable) has been deleted.*

## INTERROGATORIES

**INTERROGATORY NO. 1:** For each POA customer for which you contend PBI used "POA's Confidential Customer Information for sales and marketing purposes without POA's written consent, to engage in unfair competition with POA in violation of Section 6.02(5)" of the Dealer Agreement, as alleged in paragraph 77(b) of the Complaint, identify (a) the customer (including address and contact person); (b) the dates of all such sales and marketing communications made to each specific customer, and (c) the amount of sales POA lost as a result of the sales and marketing efforts by PBI.

**ANSWER:**

Most of the information responsive to this request is in the possession, custody and control of PBI/Defendants and not POA.  Without waiving the right to supplement, POA identifies examples of PBI's use of Confidential Customer Information in the spreadsheet attached and identifying relevant communications by Date, To/From, and the Interrogatory No. to which the listed email(s) are responsive.

*Specific emails identified that relate to this category include emails:*

| *Date* | *From* | *To* |
|---|---|---|
| *June 1, 2017* | *Dave White (POA)* | *Nicole O'Connell (PB)* |
| *June 5, 2017* | *Partner Support* | *Dave White, Nicole O'Connell (PB)* |
| *June 2, 2017* | *Nicole O'Connell (PB)* | *Rob Murray (POA) and Greg Pattison (PB)* |
| *October 20, 2017* | *Nicole O'Connell (PB)* | *Sonny O Grady (POA)* |

POA is providing all of its emails in native format, simultaneously with this written Response, and the spreadsheet is intended to identify those particular emails that are responsive. POA specifically preserves its right to locate additional responsive emails and/or documentation and will certainly supplement if and when additional items are located.

2 – **SECOND SUPPLEMENTAL** RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Since the time of this interrogatory response, POA has answered Defendants' SECOND Request for Production and has identified additional information including customer-specific information for Michael Arveseth (POA customer) contacted by Raphael Dallas of Pitney, and various customers contacted directly by Veronica Urcioli of Pitney, referencing specific terms of POA's Leases/Customers.  In addition, POA has now disclosed its discovery that Pitney has captured all of POA's customer information (for those POA customers who POA sold/leased Pitney mailing equipment) into its Customer Relations Management ("CRM") software, SalesForce.  Pitney continues to use POA's customer contact information, lease terms, and lease specifics (including types of equipment, accessories, etc.) in order to conduct a widespread campaign of sales to POA's customers, specifically.

*Now that PB has responded to POA's discovery and some key depositions have taken place, POA supplementally identifies the following information as responsive to this Interrogatory:*

*PB_POA_0079858 to 0079860 demonstrates that Pitney Bowes took a "POA List" of accounts and distributed that list to POA's direct competitor, Kelley Connect.  Additionally, Mr. Cory testified Pitney "ha[s] a list of all POA accounts" that it gave to Terry Boyle at Kelley Connect and Pitney's own direct sales force.  POA has now subpoenaed the full list from Kelley Connect and will produce that list when it is provided.*

*Other examples of Pitney's actions, whether or not a violation of §6.02(5) of the Dealer Agreement include (but are not limited to):*

| | |
|---|---|
| PB_POA_0078327-331 | PB_POA_0066092; 0066131-133 |
| PB_POA_0078342-345 | PB_POA_0078327-331 |
| PB_POA_0066353-359 | PB_POA_0078342-345 |
| PB_POA_0066395-396 | PB_POA_0064510-512 |
| PB_POA_0066443 | |
| PB_POA_0066615 | |

3 – **SECOND SUPPLEMENTAL** RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 2:** Identify all agreements and/or communications pursuant to which Defendants "prohibit[ed] [POA] from selling any other brands of mailing equipment" (as alleged in paragraph 15(2) of the Complaint).

**ANSWER:**

The Dealer Agreement, itself, includes a prohibition for POA to sell any other brands of mailing equipment. While POA negotiated a "carve out" to be permitted to continue selling the Francotyp-Postalia ("FP") brand, PBI insisted that such equipment/brand could not be offered to or sold to any customer who already had PBI equipment and/or was a PBI customer of any type.

Without waiving the right to supplement, POA identifies communications surrounding this issue in the attached spreadsheet.

*Additionally, now that some of the key depositions have taken place, POA identifies that each Harris Warsaw, Bernard Cory, Trey Sawyer, and Robert Lamke testified that Pitney Bowes was frustrated by POA's continued sales of any products that were competitive with Pitney. The sale of competitive produce was used, in part, to make the decision that POA not be renewed as a Dealer.*

**INTERROGATORY NO. 4:** For each instance in which any of the Defendants accused POA of "'interference' when competing with an existing customer" (as alleged in paragraph 61 of the Complaint), identify (a) the employee, representative, agent or contractor of Defendants who made such accusation and (b) the relevant customer.

4 – **SECOND SUPPLEMENTAL** RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES

**ANSWER:**

Without waiving the right to supplement, POA identifies examples of the alleged interference in the attached spreadsheet.

**INTERROGATORY NO. 5:** For each instance in which any of the Defendants refused to "provide POA with 'buyout' figures and/or necessary information of existing customers" (as alleged in paragraph 62(b) of the Complaint), identify (a) the information POA requested, (b) the employee, representative, agent or contractor of Defendants to whom the request was made, (c) the date of the request, and (d) amount of financial harm POA incurred as a result of Defendants' alleged refusal to provide the information.

**ANSWER:**

(a)-(c) Without waiving the right to supplement, POA identifies of a number of communications surrounding this issue and responsive to this interrogatory in the attached spreadsheet. POA further discloses the "native" emails where additional responsive information may be found.

*See also, as examples:*

*PB_POA_0066092; 0066131-133*

*PB_POA_0078284*

*PB_POA_0078290-293*

*PB_POA_0078295-298*

(d) POA is unable to ascertain the amount of "financial harm" based solely on this issue, but it expressly reserves the right to hire a damage expert witness to assess all categories and specific amounts of damages, which will be timely provided to supplement this response.

5 – **SECOND SUPPLEMENTAL** RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 6:** For each instance in which Defendants required "POA to utilize Pitney Bowes Leasing Affiliates on all transactions including only Pitney Bowes Products" (as alleged in paragraph 82(a) of the Complaint), identify (a) the communication(s) in which the defendants imposed the requirement; (b) the relevant customer; (c) the date of the transaction; (d) the alternative financing terms that were available to the customer through an alternative financing entity; and (e) the amount of the financial harm POA incurred as a result of being "required" to use Pitney Bowes Leasing Affiliates.

**ANSWER:**

(a)-(c)  First, the Dealer Agreement required that POA utilize PBI affiliates on all transactions.  *See*, Paragraph 50 of the Complaint; *see*, Dealer Agreement.  POA insisted that the Agreement be changed to limit this requirement to only existing PBI customers (which was approved).  Thereafter, PBI insisted that POA use its financing entities, reminding POA that "Leasing is the sacred cow for PB."

PBI then "terminated" POA's Dealer Agreement and instituted/provided an entirely new Agreement mandating financing through a PBI affiliate.  *See*, 2019 Dealer Agreement.

Without waiving the right to supplement, POA identifies examples of communications responsive to this request in the attached Excel spreadsheet.

(d)  The possibility of alternative financing terms would have to be discovered on a case-by-case basis for each and every customer to whom POA offered equipment during a 3+ year timeframe.  Such information is not readily available nor easily ascertainable.  Without waiving these objections, POA has provided information from multiple alternative financing entities (including CFS, CIT, DLL, TIAA, US Bank, and Wells Fargo) that routinely offered alternative terms to customers and could, in large part, better financing terms than PBI affiliates.

(e)  POA is unable to ascertain the amount of "financial harm" based solely on this issue, but it expressly reserves the right to hire a damage expert witness to assess all categories and specific amounts of damages, which will be timely provided and will supplement this response.

6 – **SECOND SUPPLEMENTAL** RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 7:** With respect to each "material misrepresentation[] to POA" or "omi[ssion] of material facts from POA" (as alleged in paragraph 90 of the Complaint), identify (a) the statement made or the material fact omitted; (b) the employee, representative, agent or contractor of Defendants who made the alleged misrepresentation or failed to disclose the material fact omitted; and (c) the communication(s) in which the misrepresentations were made or the material facts were omitted; and (d) the date of the misrepresentation or omission.

**ANSWER:**

As fully explained in the Complaint, paragraphs 46-55, PBI made material representations to POA that included: promises of fair competition, promises that POA could sell to both existing and new customers, promises that PBI would not have its "Expectation Targets" increased any more than 9% of the prior year's expectations, and promises of a Tiered commission structure and "special programs" to help with lead generation and access to PBI's "inside" sales group.

The above representations were made by a variety of PBI employees and were also included in written formats made during the June-July, 2016 timeframe. These communications specifically included representations made by Kevin Thompson (of PBI) and Greg Pattison (PBI) and made to Doug Pitassi (POA) and Rob Murray (POA), at a minimum. The written documentation is also included in "PB Partner Meter Price Book," the "PB Master Partner Solutions Price Book" and written representation of Kevin Thompson to Rob Murray (*see, e.g.,* June 30, 2016 email chain provided herewith) promising that POA would be a "Tier 3 dealer" and given a "40% discount" from the published pricing. The actually-signed Dealer Agreement includes several of the misrepresentations as well, promising POA its terms for 3 years.

SUPPLEMENTAL RESPONSE:

(a)   The material misrepresentations of fact and material omission(s) by Pitney include, <u>at</u> <u>least</u>:

7 – **SECOND SUPPLEMENTAL** RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES

1. As a Pitney Dealer, POA was going to be able to sell to new customers and existing Pitney customers, alike, with the discounted rates that Pitney offered to its qualified Dealers. (Material misrepresentation)

2. *Pitney was looking forward to having POA "challenge" its inside sales and direct sales in the Market.  (Material misrepresentation)*

3. POA would be offered lease financing through Pitney, which POA could offer to customers at competitive rates (Material misrepresentation)

4. *Pitney would not allow Leasing to be the obstacle to this partnership. (Material misrepresentation)*

5. POA was going to receive a great "deal" to purchase Send PRO 300 machines from Pitney, which POA could resell to customers easily (Material misrepresentation)

6. POA would be given "Expectation Targets" to meet as a Dealer, but these expectations could not be increased any more than 9% of the prior year's targets/expectations (Material misrepresentation)

7. POA would be paid a tiered commission structure and would be given "special programs" to help with lead generations for new sales, and POA would be given access to Pitney's "inside" sales group (Material misrepresentation)

8. The Dealer Compensation Program was underway of a significant change at the time POA became a dealer, and within months of POA's signature, the entire commission structure changed to POA's detriment (Material omission)

9. Pitney's in-house (or "inside") sales group was sharing information with its "help" channel, and as POA sought help for configuring solutions for its customers, Pitney's internal channels were sharing information (Material omission)

8 – **SECOND SUPPLEMENTAL** RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES

> 10. Pitney charged POA the normal Manufacturer's Retail Pricing if POA sold equipment to an existing Pitney customer, which was an effort to stop POA from selling to existing Pitney customers (Material omission)

(b)    Pitney employees Greg Pattinson and Kevin Thompson made most of the specific misrepresentations discussed above, but the written materials (including the Dealer Contract, the Pitney "PB Partner Meter Price Book" and "PB Master Partner Solutions Price Book" (along with the Tier 3 Compensation program) also contained the material misrepresentations about pricing expectations and "discount" expectations.  These documents contained the misrepresentations of what pricing POA would be given and the length of time that POA could expect to receive the offered discounts (3 years).

Pitney employees, Greg Pattinson, Bernard Cory, Kevin Thompson, Nicole O'Connell, and *Trey Sawyer* are the parties who are at least responsible for omitting material facts to POA, including: 1) that Pitney was in the midst of restructuring its Dealer Compensation Program at the time POA was being offered a 3-year contract term on specific compensation terms/promises; 2) that Pitney would start charging POA full MSRP if POA were to sell to an existing Pitney customer; 3) that Pitney shared information from its "help" channels offered to Dealers with its own, inside sales team; 4) that Pitney would not keep its promise to maintain expected sales targets for at least one (1) year at a time; *5) that Pitney offered a "special" program on the SP300 machines to POA when it knew the product was being "sunset."*

(c)    Many of these misrepresentations made (above) were made in oral communications throughout a series of meetings between Greg Pattinson, Bernard Cory and POA representatives Rob Murray and President Douglas Pitassi.  Other representations were made orally in phone conversations in the May-July timeframe of 2016.  Written material misrepresentations were made: 1) in the written Dealer Agreement, 2) the written "PB Partner Meter Price Book" and "PB Master Partner Solutions Price Book" (along with the Tier 3 Compensation program), 3) in emails between Pitney and POA, identified on the spreadsheet produced as being specifically responsive to Interrogatory No. 7.

9 – **SECOND SUPPLEMENTAL** RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES

(d) The dates of the oral material misrepresentations were between May-July 2016, as Pitney and POA were beginning their working relationship. The written misrepresentations were made in June 2016, as the written documents were provided to POA as part of its contract and the Dealer Agreement, pricing books and Compensation Program(s) were provided. The additional writings that contained misrepresentations by email are each individually dated as identified in the table below, and all of the actual emails have been produced. ***With regard to the separate (but material) misrepresentations about the SendPro 300 machines and the material omission of its "sunset," such representations and omissions were made during January 2017.***

Multiple emails demonstrate how the misrepresentations were discovered/learned, and the following table identifies the date, sender(s) and recipient(s) of emails already produced.

| *Email date(s)* | *Email from* | *Email to* |
|---|---|---|
| June 27 to 30, 2016 | Kevin Thompson (PB) | Rob Murray (POA) |
| July 27, 2016 | Gregory Pattison (PB) | Doug Pitassi (POA) |
| January 31, 2017 | Gregory Pattison (PB) | Rob Murray (POA) and Nicole O'Connell (P… |
| May 17, 2017 | Nicole O'Connell (PB) | Nate Eddy (POA) |
| August 15, 2017 | Nicole O'Connell (PB) | PartnerSalesSupport and Madeline Becker (… |
| October 13, 2017 | Karl Fink (PB) | James Freeman (POA); Nicole O'Connell (P… |
| November 28, 2017 | Rob Murray (POA) | Nicole O'Connell (PB) |
| November 29, 2017 | Nicole O'Connell (PB) | Rob Murray (POA) |
| November 29, 2017 | Nicole O'Connell (PB) | Scott Brenton (POA), Tyrone Lacsina (PB) |
| December 12, 2017 | Nicole O'Connell (PB) | Rob Murray (POA), Scott Brenton (POA) |
| December 29, 2017 | Nicole O'Connell (PB) | Rob Murray (POA), Scott Brenton (POA) |
| January 1, 2018 | Robert Lamke (PB) | Nicole O'Connell (PB), Scott Brenton (POA) |
| January 2, 2018 | Rob Murray (POA) | Scott Brenton (POA) |
| March 30, 2018 | Trey Sawyer (PB) | Scott Brenton (POA) |
| April 5, 2018 | Rob Murray (POA) | Doug Pitassi (POA) Scott Brenton (POA) |
| April 5, 2018 | Rob Murray (POA) | Trey Sawyer (PB) |
| April 5, 2018 | PBDealers@pb.com | Jennifer Larson (POA) |
| April 6, 2018 | Scott Brenton (POA) | Rob Murray (POA) and Bernard Cory (PB) |
| June 20, 2016 | Scott Brenton (POA) | Robert Lamke (PB) |
| June 14, 2018 | Trey Sawyer (PB) | Robert Van Laarhoven (POA) |
| November 13, 2018 | Megan Tegen (Client) | Chris McReynolds (POA) |
| April 11, 2019 | Ross Guilford (Client) | Scott Brenton (POA) |
| June 19, 2019 | Ed Wintersteller (PB) | Scott Brenton (POA) |
| July 11, 2019 | PartnerSalesSupport (PB) | Scott Brenton (POA) |
| July 16, 2019 | Michael Whitesell (POA) | Laura Jacobson (Client) |

10 – **SECOND SUPPLEMENTAL** RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES

*In addition to its prior answers, POA further identifies these materials as evidence of Pitney Bowes' material misrepresentations and/or material omissions of fact:*

PB_POA_0066688-689

PB_POA_0078321

PB_POA_0078326

PB_POA_0078277

- Trey Sawyer testimony regarding the 2017 Compensation Plan
- Greg Pattison testimony regarding the promises made to POA

11 – **SECOND SUPPLEMENTAL** RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 9:** Provide a computation of each category of damage alleged by POA in the Complaint, including (a) the means or method by which POA computed the alleged financial damage, (b) the date POA incurred each alleged amount of damages.

**ANSWER:**

POA suffered compensatory damages for loss of business and loss from its investment into the PBI Dealer Agreement/Partnership, which is computed by measuring the loss of profitability during the Agreement, the loss of profitability by PBI's unilateral changes and termination, and the actual funds expended for training/purchasing PBI product. POA further suffered loss of reputation/loss of relationship damages, and Pitney is responsible for statutory and punitive damages. The categories of damages include:

1. Initial *costs* incurred in training, ***identified as $311,898.65, above.***
   *(**This amount may continue to be supplemented to include any additional hard costs incurred for the Kick Off costs (as explained above)).***

12 – **SECOND SUPPLEMENTAL** RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES

    **2.**    POA's Initial Investment in Equipment *to solidify the relationship.*

        $993,037.00 (initial investment cost, paid on March 20, 2017 for PO 294207)

        $373,500.00 (initial investment cost, paid on February 9, 2017 for PO 296451)

These figures represent costs associated with POs 294207 and 296451, which were the initial investment costs of *"stock equipment" and "demo" equipment that POA was asked to purchase in the beginning of the relationship* and the initial purchase of Send Pro 300s. PO Numbers 294207, 296451 were previously provided in POA 000084-000086. The backup documentation for payments of these POs is included/produced as POA 000620-000627, which provides Pitney with the PO number provided by POA, the Invoice number(s) as invoiced by Pitney to POA, the POA check numbers used to complete the purchase and the date of the POA check paid to Pitney.

    **3.**    Lost profit for equipment sales and loss of service agreement revenue.

        $1,751,515 in lost equipment sales profit

        $1,300,000 in lost service revenue profit (which includes residuals)

The lost equipment profitability was calculated specifically by taking the true cost of goods sold during the initial 3-year term of the Dealer Agreement ($5,151,515) and subtracting the actual cost paid to Pitney during that same term ($3,400,000), which results in the difference of $1,715,515 as the lost profitability.

The lost service revenue profitability was calculated by determining the amount of service revenue (total) generated from the first 3-year term of the Dealer Agreement, recognizing that most service agreements are entered for 5 years. By taking the revenue generated from the loss of one renewal term of the Dealer Agreement and simply extracting profit from revenue (POA's typical profitability on service agreements can be calculated at a 50% profit margin), the net result is a loss of $1,300,000 from Pitney's failure to renew the Dealer Agreement. This figure, of course, would increase if POA considers the length of its average customer life (a minimum of 14 years).

13 – **SECOND SUPPLEMENTAL** RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES

The initial $1.3MM should/could be estimated at a loss X the 2 additional renewal terms POA would expect from the lifespan of its customers. This would increase the $1.3MM figure to an estimated $3.9MM loss.

*POA may continue to revise or update its lost profit analysis and will supplement its lost profits if additional information provides for a varied method of analysis and/or a varied result on lost profits.*

    **4.**    Loss of Relationship/Reputation Damages (and related cost investment)

As a result of the Pitney Dealer Agreement, FP initially "canceled" POA as a dealer of FP equipment. POA was required to make a large investment in FP equipment in order to salvage the FP relationship, which it did. POA's relationship with FP was harmed, and after Pitney chose not to renew the Dealer Agreement with POA, POA was made to invest significant time and energy in reviving its relationship with FP.

    **5.**    Punitive Damages in an amount of not less than $1,000,000

    **6.**    Attorneys' Fees in the estimated amount of $750,000 through trial

    **7.**    Treble Damages pursuant to the Sherman Act

This damage information will be supplemented, but it can presently be estimated in the foregoing amounts and testified to by Doug Pitassi, the POA President who carries significant industry experience and knowledge with profit margins of POA (and the industry as a whole) sufficient to provide a lost profit analysis. The initial figure(s) may change as discovery progresses, but it is anticipated that Mr. Pitassi may offer the damage calculation(s) and estimations extrapolating from known data of the amount of Pitney equipment that POA was able to place/sell during the parties' relationship.

*POA intends to hire a damage expert in "Phase 2" of this matter, as the parties agreed that expert disclosures would not be required until the completion of fact discovery. Any and all damage analyses must be deemed incomplete until POA provides its expert financial analysis (particularly on the issue of lost profitability).*

14 – **SECOND SUPPLEMENTAL** RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 16:** Identify all "other competing brands" that POA excluded from its sales portfolio as a result of alleged misrepresentations and material omissions by Defendants (as alleged in paragraph 97(c) of the Complaint), including (a) the name of the competing brand, and (b) the date POA excluded such competitor from POA's sales portfolio.

**ANSWER:**

The additional competing manufacturers/brands are identified in paragraph 33 of the Complaint and include Neopost and Data-Pac.

POA did not exclude existing brands from its portfolio, rather POA refrained from discussions with any other brand(s)/manufacturers as a result of its Dealer Agreement with Pitney. Once POA became an authorized Dealer to sell Pitney equipment, it pledged loyalty and focused heavily on Pitney equipment and only Pitney. POA lost its relationship and reputation with FP as a result of the Pitney Dealer Agreement, as explained above.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of July, 2021 I caused to be served a PDF version of the foregoing upon all counsel of record via electronic mail.

    Philip S. Van Der Weele
    Email: phil.vanderweele@klgates.com
    K&L Gates LLP
    One SW Columbia Street, Suite 1900
    Portland, Oregon  97204
    Telephone:   +1 503 228 3200
    Facsimile:    +1 503 248 9085
    Attorneys for Defendants

DATED this 23rd day of July, 2021.

        /s/ Veronica L. Manolio
        Veronica L. Manolio, Admitted *Pro Hac Vice*

18 – **SECOND SUPPLEMENTAL** RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES