UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PACIFIC OFFICE AUTOMATION INC.,                              Case No. 3:20-cv-651-AR

                        Plaintiff,                           **OPINION AND ORDER**

        v.

PITNEY BOWES INC., *et al.*,

                        Defendants.

_____

**ARMISTEAD, Magistrate Judge**

        In 2016, Pacific Office Automation (POA) and Pitney Bowes Inc. entered into a three-

year agreement in which POA would be an authorized dealer for Pitney's mailing equipment (the

agreement). The business relationship soured and POA sued Pitney, alleging that Pitney

breached the agreement, including its express incorporation of the covenant of good faith and

fair dealing (Claim 1), and violated the Connecticut Unfair Trade Practices Act (Claim 2) by

making substantial changes to the dealer compensation plan, using POA's confidential customer

Page 1 – OPINION AND ORDER

information to compete against POA, interfering with POA's ability to sell to Pitney's existing customers, and refusing to renew the agreement under fair and equitable terms.[1] (Compl. ¶¶ 60, 76-82, ECF No. 1.) Pitney counterclaims that POA breached the agreement by selling or leasing competitor products to existing Pitney customers. (Answer & Countercl. at 20, ECF No. 60.)

Pitney seeks summary judgment on POA's breach of contract and CUPTA claims. Pitney contends that, for each factual basis underlying POA's claims, POA will be unable to meet its burden at trial to show either (1) that the alleged actions occurred or (2) that the alleged actions affected POA's ability to operate under the agreement.[2] (Def.'s Mot. at 9-11, ECF No. 110.) POA responds by pointing to emails, deposition testimony, the declaration of its president, Doug Pitassi, and the terms of the 2017-2019 compensation plan to show that there are genuine disputes of fact as to whether the alleged conduct occurred and harmed POA. (Pl.'s Resp., ECF No. 138.) POA's identified evidence, however, fails to establish genuine issues of material fact and would not allow a rational trier of fact to find in its favor. The court therefore grants Pitney's motion for summary judgment.[3]

## BACKGROUND

The following facts are undisputed. Pitney Bowes is an authorized manufacturer of postage meters and sells its equipment through both its internal sales team and outside dealers.

---

[1]     POA also alleged three other claims: monopolization, attempted monopolization, and fraudulent inducement, which have been voluntarily dismissed by POA. (ECF No. 141.)

[2]     The court held oral argument on Pitney's Motion for Summary Judgment on April 10, 2024. (ECF No. 161.)

[3]     The parties have consented to jurisdiction by magistrate judge as permitted by 28 U.S.C. § 636(c)(1). (Full Consent, ECF No. 64.)

POA is an office equipment dealer. The parties entered into a three-year dealer agreement, effective June 30, 2016, which set out the terms for POA to be a dealer of Pitney equipment. (Dealer Agreement at 1, § 7.01(1), ECF No. 1-1.) At the time they entered into the agreement, POA was also a dealer for another manufacturer, Francotyp-Postalia (FP). The agreement allowed POA to continue selling FP products, as long as those sales would not displace Pitney products. (*Id.* § 6.03(2), Schedule D.)

After signing the agreement, POA invested in obtaining training for its employees to sell Pitney products. Pitney hosted trainings in Seattle, Portland, and Phoenix in 2016, and POA spent more than $300,000 to send its employees to those trainings. (Pitassi Decl. ¶ 6, ECF No. 139.) POA bought more than $1 million in Pitney products in 2016. (ECF No. 140-13.)

The agreement provided that POA would buy Pitney equipment and receive discounts and commissions as set out in the dealer manual. (Agreement § 5.01(1).) At the time that POA entered into the agreement, it fell within "Tier 3" of the then-effective dealer compensation plan because it was projected to sell more than $600,000 worth of product per year. Under Tier 3, POA would receive 40 percent off the suggested retail price (SRP) when purchasing equipment from Pitney. (Pattison Dep. at 251:16-25, ECF No. 140-9; 2016 Compensation Plan, ECF No. 111-13.)

In October 2016, however, Pitney announced a new compensation plan (the 2017-2019 plan). The new compensation plan, which Pitney began working on sometime during the summer of 2016, was to take effect in 2017. (Pattison Dep. at 93:15-94:11, ECF No. 140-3.) The 2017-2019 plan was composed of five tiers, instead of three. (2017-2019 Compensation Plan at 1, ECF No. 111-15.) Under the new plan, commission payments made to a dealer depended on the

dealer's tier, which in turn depended on the dealer's purchases from Pitney the preceding year. (*Id.* at 1; Cory Decl. ¶ 71, ECF No. 111.)

The 2017-2019 compensation plan distinguished between customers who were new to Pitney (growth customers) and customers with whom Pitney had already placed equipment (legacy customers). Under the new compensation plan, dealers could not sell to legacy customers at prices that exceeded SRP, and any placement of products with legacy customers had to go through Pitney leasing affiliates. (2017-2019 Compensation Plan at 3.) The new plan provided that dealers would not receive discounts or bonuses for products placed with legacy customers, unless the legacy customer was categorized as "at-risk." (*Id.* at 1.) The 2017-2019 compensation plan also offered more generous commissions for growth business. (Cory Decl. ¶ 58 n.11; 2017-2019 Compensation Plan at 1.)

Before the new compensation plan took effect, POA submitted a purchase order that contained terms different from those included in the 2017-2019 compensation plan. Under that December 2016 purchase order, POA received 40 percent off suggested retail price (SRP) on equipment it purchased, and was allowed to place that equipment with legacy or growth customers. The purchase order also provided that POA could make future purchases at the discounted "growth" rate provided in the 2017-2019 compensation plan. (ECF No. 111-17.) Because of that term in the December 2016 purchase order, POA always received a discount of at least 30 percent off SRP on its purchases through 2017, 2018, and 2019, whether the equipment was placed with legacy or growth customers. (Cory Decl. ¶¶ 56-67 & Exs. 17-19; *see also* Pl.'s Resp. at 18.) POA also purchased SendPro (SP) 300s on terms that differed from the 2017-2019 program, including a $600 rebate per SP 300. (Cory Decl. ¶¶ 66-67 & Exs. 19, 20.)

POA placed equipment with hundreds of legacy and growth customers while the 2017-2019

compensation plan was in effect. (ECF No. 111-21.)

The three-year agreement was set to expire on June 30, 2019. (Agreement at 1,

§ 7.01(1).) The parties agreed to extend the existing dealer agreement while they attempted to

negotiate a new one. Entering into three different extensions, they extended the dealer agreement

through December 25, 2019. (Warsaw Decl. ¶¶ 5-7 & Exs. 1-3.) The parties negotiated

throughout 2019 but failed to reach mutually acceptable terms for a new dealer agreement. (*Id.*

¶¶ 8-15 & Exs. 4-7; Pitassi Decl. ¶¶ 12-21 & Exs. 2-6.)

### SUMMARY JUDGMENT STANDARDS

A party is entitled to summary judgment under Rule 56 "only if, taking the evidence and

all reasonable inferences in the light most favorable to the non-moving party, there are no

genuine issues of material fact, and the movant is entitled to judgment as a matter of law."

*Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1104 (9th Cir. 2020) (quoting *Tauscher v.*

*Phx. Bd. of Realtors, Inc.*, 931 F.3d 959, 962 (9th Cir. 2019)); FED. R. CIV. P. 56(a). A dispute is

genuine only if there is sufficient evidence "such that a reasonable jury could return a verdict for

the nonmoving party," and a fact is material only if it might affect the outcome of the case.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment involves burden shifting. Pitney, as the moving party without the

ultimate burden of persuasion at trial, has "both the initial burden of production and the ultimate

burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v.*

*Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry its burden of production, Pitney "must

either produce evidence negating an essential element of the nonmoving party's claim or defense

or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id.* To carry its burden of persuasion, Pitney "must persuade the court that there is no genuine issue of material fact." *Id*. If Pitney carries its burden of production, POA, as the non-moving party, must produce evidence to support its claims, *id*. at 1103, and must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996); *F.T.C. v. Stefanchik,* 559 F.3d 924, 929 (9th Cir. 2009) ("A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment."). If POA fails to make that showing, then Pitney is entitled to summary judgment. *Nissan Fire*, 210 F.3d at 1103.

## PRELIMINARY MATTERS

Before turning to its discussion of POA's claims, the court addresses three preliminary matters: whether to strike the declaration of Bernard Cory, how to treat the declaration of Douglas Pitassi, and whether to consider new factual bases alleged in POA's response on summary judgment.

### A.    *Motion to Strike Cory Declaration*

POA asks the court to strike the expert disclosure of Bernard Cory (a former Pitney employee) and parts of Cory's declaration submitted in support of Pitney's motion for summary judgment. POA argues that Cory's disclosure, and the parts of his declaration that restate testimony from that disclosure, should be excluded because his disclosure is an improper rebuttal report under Federal Rule of Civil Procedure 26(a)(2)(D). (Pl.'s Resp. at 34.) Pitney disputes that the rebuttal report is improper. (Def.'s Reply at 17, ECF No. 154.) And, even if the report should have been disclosed earlier, Pitney contends that the late disclosure was harmless and need not

be struck under Federal Rule of Civil Procedure 37(c). (*Id.* at 19.) Further, Pitney argues that the parts of the Cory Declaration that POA seeks to strike are admissible under Federal Rule of Evidence 1006 as a summary of other records that were produced to POA. (*Id.* at 20.)

In its briefing, POA identified no harm to it from Cory's rebuttal report. (*See* Pl.'s Resp. at 34-35.) At oral argument, it clarified that it does not dispute the admissibility of any portion of the Cory Declaration; instead, its motion to strike is based on harm to POA if Cory's conclusions are given extra weight due to his designation as an expert.

At summary judgment, the court determines whether, considering the entire record before it, a rational trier of fact could find for the nonmoving party. *Matsushita*, 475 U.S. at 587. In doing so, the court does not weigh the evidence. *Marable v. Nitchman*, 511 F.3d 924, 929 (9th Cir. 2007). Weighing the evidence and, likewise, challenges that go to the weight of the evidence "are within the province of a fact finder." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014). Here, the court's analysis of whether there is a genuine dispute for trial does not hinge on whether the Cory Declaration is based on lay or expert testimony. The factual conclusions contained in the declaration, supported by Pitney's records, do not preclude a genuine issue of material fact: POA can show that there is a genuine dispute of fact by providing evidence of specific facts that contradict those conclusions. Accordingly, the court concludes that there is no harm to POA from the Cory Declaration and denies POA's motion to strike.

**B.    *Pitassi Declaration***

Pitney argues that the statements contained in paragraph 11 of the Declaration of Doug Pitassi (ECF No. 39) cannot create a genuine dispute of material fact because Pitassi does not have first-hand knowledge of the conduct he describes and because each of Pitassi's statements

is an unsupported, conclusory allegation. (Def.'s Reply at 38-39.) POA responds that, because Pitassi is the President of POA and was involved in negotiating the dealer agreement, he has personal knowledge of the contract and Pitney's interference with POA's performance under it. (Pl.'s Surreply at 2, ECF No. 156.) POA also identifies other evidence in the record to support some of Pitassi's statements in paragraph 11. (*Id.* at 4-7.)

The court agrees with Pitney that Pitassi's position as President of POA and his role in negotiating the dealer agreement does not establish that he has personal knowledge of Pitney's internal communications or of Pitney's communications with its customers. Accordingly, Pitassi's statements do not create a genuine issue of material fact as to those issues. FED. R. CIV. P. 56(c)(1)(A), (c)(4).

The court also agrees that some of Pitassi's statements in paragraph 11 are conclusory allegations and do not provide evidence of specific facts. "To survive summary judgment, a plaintiff must set forth non-speculative evidence of *specific facts*, not sweeping conclusory allegations." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) (emphasis added); *see also Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*, 310 F. Supp. 3d 1089, 1104 (S.D. Cal. 2018) ("[D]eclarations that contain only conclusory statements, instead of specific facts, are insufficient [to defeat a motion for summary judgment] unless accompanied by other evidence to corroborate the statements."). Pitassi's conclusory statements characterizing Pitney's conduct will only create a genuine issue for trial if they are supported by admissible evidence of specific facts, laid out in POA's surreply. With this framework in mind, the court will address later in this opinion specific statements on which POA relies.

\\\\\

Page 8 – OPINION AND ORDER

**C.**    ***New Factual Bases for POA's Claims in its Response***

For the first time in its Response to Pitney's Motion for Summary Judgment, POA

contends that Pitney either breached the covenant of good faith and fair dealing or violated

CUTPA by (1) inducing POA to buy SP 300s, which POA asserts were subquality products,

(2) failing to provide adequate training, and (3) failing to provide adequate sales support. (Pl.'s

Resp. at 19, 27, 30-33.)

New factual bases for claims in a response to a summary judgment motion are improper

under Federal Rule of Civil Procedure 8's notice pleading standards. *Pickern v. Pier 1 Imports*

*(U.S.), Inc.*, 457 F.3d 963, 969 (9th Cir. 2006). When a plaintiff fails to specify the factual bases

for its claims in its complaint, the defendant does not receive "fair notice of what the plaintiff's

claim is and the grounds upon which it rests." *Id.* (quotation marks omitted). "A plaintiff may not

make vague and generic allegations in a complaint and simply add facts as discovery goes along

without amending the complaint because to do so 'would read the "fair notice" requirement out

of Rule 8 and would seriously undermine the rule's goal of encouraging expeditious resolution of

disputes.'" *Adobe Lumber Inc. v. Hellman*, Case No. CIV. 2:05-1510 WBS EFB, 2010 WL

760826, at *5 (E.D. Cal. Mar. 4, 2010) (quoting *Pickern v. Pier 1 Imports (U.S.), Inc.*, 339 F.

Supp. 2d 1081, 1088 (E.D. Cal. 2004)).

SP 300s and subquality products are mentioned nowhere in POA's Complaint. Nor is it

alleged that there was insufficient training or insufficient support for POA sales. Those factual

bases, raised for the first time in POA's Response, are improper. The court declines to consider

POA's arguments in opposition to summary judgment to the extent they rely on new factual

allegations. *Pickern*, 457 F.3d at 969; *see also Pena v. Taylor Farms Pac., Inc.*, Case No. 2:13-

CV-01282-KMJ-AC, 2014 WL 1330754, at *4 (E.D. Cal. Mar. 28, 2014) (declining to consider argument based on new factual bases in response to summary judgment motion).

With those preliminary matters resolved, the court turns to the merits of Pitney's motion for summary judgment.

## DISCUSSION

Having voluntarily dismissed three of its claims, POA has two claims remaining: breach of contract, including breach of the covenant of good faith and fair dealing (Claim 1), and violation of the Connecticut Unfair Trade Practices Act (Claim 2). POA alleges multiple factual bases for each claim.

As to breach of contract, POA alleges that Pitney violated the terms of the dealer agreement by misusing POA's confidential customer information, implementing the 2017-2019 dealer compensation program, and changing POA's sales expectation targets. To prevail on an action for breach of contract under Connecticut law, POA must prove "formation of an agreement, performance by one party, breach of the agreement by the other party and damages." *Coppola Const. Co. v. Hoffman Enters.*, 157 Conn. App. 139, 159 (2015) (quotation marks omitted).

POA further alleges breach of contract on the theory that Pitney violated the covenant of good faith and fair dealing. Pitney did so, POA contends, by obstructing renewal of the dealer agreement, failing to approve at-risk designation for customers, failing to activate customer meters, failing to provide and honor buyout figures, and implementing the 2017-2019 dealer compensation program. Under Connecticut law, "every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the

agreement." *Geysen v. Securitas Sec. Servs. USA, Inc.*, 322 Conn. 385, 399 (2016). That duty, the covenant of good faith and fair dealing, "presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." *Id.* "Essentially, [the implied covenant of good faith and fair dealing] is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended." *Magnan v. Anaconda Indus., Inc.*, 193 Conn. 558, 567 (1984).

As to Claim 2, POA alleges that Pitney violated the Connecticut Unfair Trade Practices Act (CUTPA) by misusing POA's confidential customer information and by implementing the 2017-2019 dealer compensation plan. To determine whether a business practice violates CUTPA, this court must consider:

> (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise . . . ; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors or other businesspersons.

*Ulbrich v. Groth*, 310 Conn. 375, 409 (2013). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* "[A] violation of CUTPA may be established by showing either an actual deceptive practice or a practice amounting to a violation of public policy." *Id.*

Pitney argues that it is entitled to summary judgment on each claim. It says: POA cannot show that Pitney misused POA's customer information; the evidence contradicts POA's assertion that Pitney obstructed renewal of the dealer agreement; POA cannot show that Pitney

ever failed to approve a customer as at-risk or activate a customer meter, or that Pitney's policy related to buyout figures interfered with POA's ability to operate under the dealer agreement; and POA cannot show that it ever operated under the unmodified 2017-2019 dealer compensation plan. Accordingly, Pitney argues, POA cannot carry its burden at trial on any of its claims.

The parties' dispute centers on whether, in response to the evidence and argument Pitney has provided, POA has supplied evidence sufficient to establish any genuine issues of material fact. Accordingly, the court assesses in turn each factual basis for POA's claims.

A.    *Misuse of POA's Customer Information – Claims 1 and 2*

POA alleges that Pitney breached Section 6.02(5) of the dealer agreement and violated CUTPA by sharing POA's customer information with Pitney's internal sales team and using that information to market Pitney's sales and services. (Compl. ¶ 16; Pl.'s Resp. at 31-32.) POA was legally required to provide Pitney with certain information about its customers, including the identity of the customers and the type of service that POA provided to those customers for Pitney products. But the agreement prohibited Pitney from using that information to market Pitney products or services to POA's customers. (Agreement § 6.02(5).) That prohibition did not apply to Pitney's preexisting customers. (*Id.* ("[N]othing in this Agreement will prevent [Pitney] from marketing, selling, leasing or renting to [Pitney] customers it obtained prior to this Agreement or during the Term, but not in connection with any efforts of PBI or Dealer under this Agreement, who may also be dealer customers.").)

In Pitney's view, POA lacks sufficient evidence to allow a reasonable trier of fact to conclude that Pitney misused POA's customer information in violation of Section 6.02(5). Pitney

points to Cory's declaration that he put a "flag" in Pitney's internal system to ensure that

Pitney's sales team could not access POA's customer information, and that none of POA's

customer information was shared with Pitney's sales team until after December 25, 2020 (when

Section 6.02(5)'s restrictions no longer applied). (Cory Decl. ¶¶ 79-80, 95.) Further, Pitney

offers an analysis of its customer database records showing that no POA customer who cancelled

a meter rental agreement with POA before December 25, 2020, proceeded to enter into an

agreement with Pitney. (*Id*. ¶¶ 79-91.) Because POA fails to provide evidence that contradicts

that analysis, Pitney maintains, POA will be unable to carry its ultimate burden at trial to show

that Pitney misused POA's customer information.

      To establish a genuine dispute of material fact as to Pitney's use of POA information,

POA points to June 2018 emails that, in POA's view, reveal "coordination between Kelley

Imaging and Pitney as early as 2018 to directly compete with POA for customers Pitney

specifically knew were already working with POA sales." (Pl.'s Resp. at 18 (citing Clarke Decl.

¶¶ 6, 22 & Exs. 5, 21, ECF No. 140).) The emails show a Pitney employee asking Kelley

Imaging (another Pitney dealer) to try to obtain the competitive quote being offered to Pitney's

existing customer, Central Linn School District. (*See* ECF No. 140-21.)

      The emails do not create a genuine issue of fact that Pitney breached Section 6.02(5) of

the agreement or failed to satisfy POA's reasonable expectations. It is undisputed that in June

2018, Central Linn was an existing client of Pitney's. (*See* Cory Dep. at 258:16-259:20, ECF No.

147-6; ECF No. 140-21.) Under the agreement, Pitney was entitled to compete with POA to keep

its preexisting client. (Agreement § 6.02(5).) And POA offers no evidence that POA ever

Page 13 – OPINION AND ORDER

provided information to Pitney regarding Central Linn or that Pitney used information from POA in its efforts to keep Central Linn as a customer. (*See* Pl.'s Resp. at 18; ECF No. 147 at 11.)

Pitney has "show[n] that [POA] does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-03. And POA has pointed to no evidence in response that creates a genuine dispute of material fact. Accordingly, Pitney's motion for summary judgment is granted as to POA's claims that Pitney misused POA's confidential customer information.

**B.**    ***Obstructing Renewal of the Agreement – Claim 1***

POA contends that Pitney violated the covenant of good faith and fair dealing by obstructing renewal of the dealer agreement. POA's factual basis for this claim is unsupported by the record. POA contends that the parties negotiated the terms of a new dealer agreement over email throughout 2019, until Pitney abruptly stopped responding after POA sent a redline draft on November 14, 2019. (Pl.'s Resp. at 21.) But Pitney did respond to POA's redline, on December 6. In that email, Pitney explained where it would be willing to compromise and which terms it considered nonnegotiable. (ECF No. 150-2.) Then, in January 2020, Pitney emailed POA to confirm that the agreement between the parties had expired on December 25, 2019. (ECF No. 140-25.) In February, POA sent Pitney a letter stating that POA was "no longer willing to negotiate terms" but that it was willing to enter the agreement in "the exact form" attached to that letter. (ECF No. 140-26 at 1.)

The original dealer agreement had a term of three years (Agreement § 7.01(1)), and Pitney was under no obligation to extend the Agreement beyond that term or to accept POA's proposed terms for any new agreement. Although Pitassi states that POA had an expectation that

the dealer agreement would be renewed (Pitassi Decl. ¶ 8), POA has provided no evidence that it had a justified expectation that the contract would be renewed on the terms that POA proposed—terms that differed from the 2016 agreement. (*Compare* Agreement *with* ECF No. 139-6 (POA's November 14 redline of the dealer agreement that Pitney sent to POA) *and* ECF No. 113-9 (proposed agreement attached to POA's final letter).) Pitney's motion for summary judgment is therefore granted as to POA's claim that Pitney obstructed renewal of the dealer agreement.

**C.**     ***At-Risk Program – Claim 1***

POA argues that Pitney violated the covenant of good faith and fair dealing by withholding approval for POA to sell to "at-risk" customers. (Compl. ¶ 61; Pl.'s Resp. at 11-12.) The record does not support POA's contention. POA provides only one example of a customer for whom it requested at-risk categorization: Tri-Met. (Pl.'s Resp. at 27 (citing ECF No. 140-28).) It supplies an email chain showing its request that Tri-Met be designated as at risk. (ECF No. 140-28 at 5.) Pitney, through Cory, initially denied the at-risk request. (*Id.* at 3.) But the POA salesperson pushed back, eventually submitting a letter from Tri-Met. (*Id.* at 1-3, 7.) Cory said he would "escalate" the issue. (*Id.* at 1.) He did so, forwarding the email chain to Michael Fischbach. (ECF No. 147-1 at 4-9.) On September 4, 2019, Fischbach approved the at-risk designation. (*Id.* at 1.) Because the emails reveal that Tri-Met was approved as an at-risk customer, those emails do not create a question of fact that Pitney ever failed to designate a customer as at risk.

POA also points to the deposition testimony of its employee, Robert Murray. Murray testified:

> I don't think they ever clearly defined what at risk meant to us. So it's hard for me to interpret what they meant because there was several scenarios where customers

said I will never do business with Pitney Bowes direct. I want you guys to sell me
a Pitney Bowes. I want you to service it. And they still will claim that was not at
risk. So it's very hard for me to define what at risk actually means here.

(Murray Dep. at 138:12-21, ECF No. 140-16.) Murray does not state that there was any specific

customer that POA requested get approved as "at-risk" that did not ultimately get that approval.

Finally, POA points to text messages between Pitney employees Gregory Pattison and

Cory, stating that "ZERO!" customers had been approved under the at-risk program. (Pl.'s Resp.

at 27 (citing ECF No. 140-29).) POA does not identify the date of those text messages. (*See id.*)

The undated messages do not create a genuine dispute of material fact that no customers were

ever approved as at-risk, nor does POA contend that no customers were ever approved as at-risk.

(*See* Pl.'s Resp. at 15 (stating that at-risk approval "was rarely granted").)

To prevail at trial, POA would need to show that, on at least one occasion, Pitney

unreasonably denied an at-risk designation. Even accepting that at-risk approval was rarely

granted, POA cannot make the necessary showing without any evidence of a customer whose at-

risk designation Pitney did not approve. The court therefore grants Pitney summary judgment as

to POA's claims based on the at-risk program.

**D.    *Failing to Activate Meters – Claim 1***

POA contends that Pitney breached the covenant of good faith and fair dealing by failing

to activate equipment that POA sold. (Pl.'s Resp. at 18, 27.) POA relies on Pitassi's declaration,

where he states that "[o]n several occasions," Pitney "fail[ed] to activate equipment sold by POA

to end users." (Pitassi Decl. ¶ 11.) In its surreply, POA supports that conclusory statement by

pointing to an email chain where a POA employee complained to Pitney that a customer's

equipment had not been activated. (Pl.'s Surreply at 5 (citing ECF No. 157 at 5).) That email

Page 16 – OPINION AND ORDER

chain does not create a genuine issue of material fact that Pitney failed to activate equipment that POA sold to end users because the final two emails in the chain show that Pitney *did* decide to activate the meter. (ECF No. 157 at 3.)

POA also indicates that it has other evidence that will support its contention that Pitney failed to activate meters: "Among others, this email correspondence is the type of evidence supporting Pitassi's testimony that Pitney interfered with POA's performance under the dealer agreement by failing to activate equipment." (Pl.'s Surreply at 5.) To show that a fact is genuinely disputed, however, POA must "cit[e] to particular parts of materials in the record" or "show[] that the materials cited [by Pitney] do not establish the absence" of a genuine dispute. FED. R. CIV. P. 56(c)(1). POA's representation that there is more evidence to come does not establish a genuine issue for trial.

**E.    *Failure to Provide and Honor Buyout Figures – Claim 1***

POA contends that Pitney breached the covenant of good faith and fair dealing by failing to provide and honor buyout figures for its existing customers, thwarting those end users from switching to leases through POA. (Pl.'s Resp. at 14.) POA relies on Pitassi's conclusory statement that, "[o]n several occasions," Pitney "fail[ed] to provide 'buyout' figures or other necessary lease information of existing customers, thwarting end users from switching/buying out of Pitney equipment, and refus[ed] to honor 'buyout' figures when provided." (Pitassi Decl. ¶ 11.) In its surreply, POA supports Pitassi's statement by pointing to the deposition testimony of Cory, a Pitney employee, that "POA was trying to settle customers' leases and . . . the biggest issue was that [Pitney] didn't have a process in place to support that." (Pl.'s Surreply at 6 (citing Cory Dep. at 52:9-16, ECF No. 157 at 8).) Cory also testified that, although at first Pitney

allowed POA to call in and get a settlement on behalf of a customer, it later changed that practice and required the customer to call Pitney to cancel the lease. (Cory Dep. at 196:21-197:5.)

To prevail on its claim of breach of the covenant of good faith and fair dealing, POA will have to prove that Pitney's change of policy on providing settlement information interfered with POA's ability to receive the benefits it was entitled to under the dealer agreement. *Geysen*, 322 Conn. at 399. Contrary to POA's argument, the change of policy alone does not demonstrate that Pitney "interfered with POA's ability to perform under the dealer agreement." (Pl.'s Surreply at 6.) The dealer agreement does not provide any guidance on how or whether Pitney was to provide settlement information to POA. (*See* Agreement.) And POA does not point to a single customer whose lease information Pitney failed to provide upon request, nor does POA identify an example where it was unable to switch an end user because of such a failure. (*See* Pitassi Decl. ¶ 11; Pl.'s Surreply at 6-7.)

POA also states that "[a]t trial, Pitassi and other witnesses from POA and Pitney will testify regarding buyout figures and whether they were honored." (Pl.'s Surreply at 7.) But that assertion does nothing to demonstrate which *specific facts* Pitassi "and other witnesses" will testify about that would allow a rational factfinder to conclude that Pitney failed to honor buyout figures. The court is not required to allow the case to proceed to trial on the assumption that witness testimony will reveal facts, favorable to POA's position, that POA has so far failed to identify. Pitney's motion for summary judgment is therefore granted as to POA's claims that are based on Pitney's alleged failure to provide or honor buyout figures.

\ \ \ \ \

\ \ \ \ \

Page 18 – OPINION AND ORDER

F.      *New Compensation Plan – Claims 1 and 2*

According to Section 5.01(1) of the dealer agreement, the discounts for POA's purchases from Pitney and its commissions and bonuses for equipment placements were set by the dealer compensation program attached to the agreement. (ECF No. 111-13.) However, Pitney "reserve[d] the right from time to time at its reasonable discretion to modify the [compensation] Program." (Agreement § 5.01(1).) POA argues that Pitney breached Section 5.01(1), as well as CUTPA and the covenant of good faith and fair dealing, when it implemented the 2017-2019 compensation plan.

POA argues that the changes to the compensation plan were not reasonable and "defeated POA's expectations and ability to receive the full benefit" of the agreement. (Pl.'s Resp. at 25-26.) Specifically, it points to the following "significant" changes: (1) the number of tiers, (2) the discounts available to dealers, (3) the at-risk program, and (4) sales to specific categories of customers. (*Id.* at 26.) POA further argues that the new compensation program violated CUTPA because it "exclusively benefited Pitney, to the detriment of POA, by making significant changes to POA's compensation structure and limiting the customers to whom POA could sell Pitney products." (*Id.* at 30.)

POA supports its arguments by reference to the terms of the 2017-2019 compensation plan and the deposition testimony of Robert Murray, a POA employee. He testified:

> [W]hen [Pitney] cut our margin and created these categorical distinctions on who you can and can't sell to, yeah, our margin was cut and our quota went way up because you took half the market on the table and so we got to get a way bigger share of what's left. And thus, we're following – we're going to fall down in our tiers thus having lower residuals and rebates and cash back from these programs.

(Murray Dep. at 72:1-12.)

Page 19 – OPINION AND ORDER

Pitney contends that POA cannot succeed on its claims based on the changed

compensation program because POA neither acknowledges nor disputes that many of the 2017-

2019 plan's terms that POA complains about never applied to POA, because POA's purchase

orders allowed POA to buy Pitney equipment on special terms. (Cory Decl. ¶¶ 57-67 & Exs. 17-

20.) It is undisputed that POA agreed to the terms contained in the purchase orders. And under

those purchase orders (and contrary to the 2017-2019 compensation plan), POA always received

at least 30 percent off SRP, whether it was placing equipment with growth or legacy customers.

(*Id.*; Pl.'s Resp. at 18.)

Nor does POA contradict Pitney's contention that the 2017-2019 compensation plan

provided better commissions for growth business. (Cory Decl. ¶ 58 n.11 & Ex. 15.) And, while

POA disputes Pitney's assertion that the changes "exceeded" POA's expectations, it does not

offer any evidence of specific facts to contradict Cory's factual conclusion that POA received

better overall pricing under the purchase orders than it would have under the original

compensation plan. (Pl.'s Resp. at 25; Def.'s Mot. at 13-15, 18; Def.'s Reply at 22-25.)

In sum, the undisputed evidence does not support POA's claims based on changes to the

dealer compensation plan. POA grounds those claims in the terms of the unmodified 2017-2019

compensation plan. (*See* Compl. ¶ 60; Pl.'s Resp. at 18, 26.) But the undisputed evidence is that

POA never operated under the unmodified plan: instead, its purchases from the end of 2016

through 2019 all had specially negotiated terms.[4] (Cory Decl. ¶¶ 57-65 & Exs. 17-20.) Further,

---

[4]        At oral argument, POA indicated that it does dispute Pitney's contention that the
unmodified 2017-2019 plan never applied to it. But POA points to no *evidence* that supports its
version of events. The Tri-Met emails do not provide evidence that the unmodified 2017-2019
compensation plan ever applied to POA: the 2017-2019 compensation plan provides for a 20

the record as a whole would not allow a reasonable trier of fact to conclude that POA received

worse overall pricing under its purchase orders than it would have under the original

compensation plan. On that record, POA will be unable to show that it was harmed by the

changes in the 2017-2019 compensation plan or that those changes were unreasonable. The court

therefore grants Pitney summary judgment on POA's claims that stem from changes to the

compensation program.

**G.**    ***Allegations Not Addressed in POA's Response – Claims 1 and 2***

POA alleged in its Complaint that Pitney violated Section 3.01 of the agreement by

changing POA's sales expectation targets and that Pitney violated CUTPA by requiring POA to

use Pitney leasing affiliates for its transactions. (Compl. ¶¶ 77(c), 82(a)-(b).) But in its Response,

POA provides no evidence to contradict Pitney's assertions that POA was not harmed by any

change in sales expectation targets and that POA was never required to use a Pitney leasing

affiliate. (Def.'s Mot. at 20, 26.) Because POA did not respond to Pitney's factual assertions, the

court considers those facts undisputed. *See* Fed. R. Civ. P. 56(e). Given those undisputed facts,

POA cannot prevail on its claims based on Pitney's change of the sales expectation targets or the

requirement that POA use Pitney leasing affiliates, and Pitney is entitled to summary judgment

on those claims.

\ \ \ \ \

\ \ \ \ \

\ \ \ \ \

---

percent discount on products sold to at-risk customers, but the emails show that Pitney told POA
it was entitled to the standard margin (30 percent discount) on products placed with Tri-Met.
(ECF No. 111-15 at 1; ECF No. 147-2 at 1.)

## CONCLUSION

For the above reasons, Pitney's motion for summary judgment (ECF No. 110) is

GRANTED.

DATED: July 15, 2024

JEFF ARMISTEAD
United States Magistrate Judge